1
2
3
4
5
6
7
8
9
10

O

# United States District Court
# Central District of California

| | |
|---|---|
| NEWAY MENGISTU,<br><br>     Plaintiff,<br><br>  v.<br><br>FORESTVIEW APARTMENTS, LLC, et al.,<br><br>     Defendants. | Case № 2:19-cv-05118-ODW (JCx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [64]** |

## I.   INTRODUCTION

Plaintiff Neway Mengistu brings suit against Defendants Forestview Apartments, LLC and Albert Navi for disability discrimination he alleges he experienced when attempting to rent an apartment from Defendants.  Defendants now move for summary judgment.  (Mot. Summ. J. ("Motion" or "Mot."), ECF No. 64.)  Having carefully considered the papers filed in connection to the instant Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.   For the following reasons, the Court **GRANTS** Defendants' Motion.

## II.   BACKGROUND

The facts of this case are largely undisputed.  Mengistu is disabled and uses a wheelchair for mobility.  (Pl.'s Statement of Genuine Disputes ("PSGD") &

Additional Material Facts ("PAMF") 48, ECF No. 66; Opp'n Mot. Summ. J. ("Opp'n") 1, ECF No. 65.)   Forestview Apartments owns, and Navi manages, an apartment complex in Los Angeles (the "Property").  (Defs.' Statement Undisputed Material Facts ("DSUF") 2, ECF No. 64-2.)   In March 2017, Mengistu applied for tenancy at a unit at the Property.  (*Id.*; PAMF 49.)  At the time, Mengistu held a valid Section 8 Housing Choice Voucher issued by the Housing Authority of the City of Los Angeles ("HACLA").  (PAMF 50.)  As this action involves Mengistu's attempt to rent a unit using a Section 8 Housing Choice Voucher, the Court pauses to briefly summarize the relevant aspects of the Section 8 program.

## A.   Section 8 Housing

"The Housing Choice Voucher program (Section 8) is a federal program operating under the authority of the United States Department of Housing and Urban Development that 'is generally administered by State or local governmental entities called public housing agencies (PHAs).'"  *Doe v. San Francisco Hous. Auth.*, Nos. A144456, A146029, 2017 WL 3474814, at *1 n.1 (Cal. Ct. App. Aug. 14, 2017) (quoting 24 C.F.R. § 982.1(a)); *see* 42 U.S.C. § 1437f(a).  "[T]he program provides low-income families a monthly subsidy to pay for a portion of their rent.  The amount of the subsidy depends, in part, on the income Section 8 families receive."  *Reilly v. Marin Hous. Auth.*, 10 Cal. 5th 583, 585 (2020), *cert. denied*, 142 S. Ct. 706 (2021).

For "tenant-based" Section 8 subsidies such as those at issue in this case, "[a]fter a Section 8 family selects an eligible rental unit approved by the applicable PHA, the PHA enters into a contract with the rental property owner."  *Id.* at 587.  The owner then "signs a lease with the Section 8 tenant . . . and also signs a Housing Assistance Payments (HAP) contract with the Housing Authority."  *Apartment Assn. of Los Angeles Cnty., Inc. v. City of Los Angeles*, 136 Cal. App. 4th 119, 123 (2006); *see Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1152–53 (9th Cir. 2011) (providing overview of Section 8 housing assistance).  The PHA pays the subsidies directly to the property owner.  24 C.F.R. § 982.311(a).

Moreover, and of particular relevance here:

> The public housing agency . . . use[s] . . . fair market rent to create a local voucher "payment standard" for each of the areas in its jurisdiction. 24 C.F.R. § 982.503(b)(1)(I).  A payment standard is the maximum subsidy payment that the housing agency will provide for each type of apartment in the area.  *Id.*  It must generally be set between 90 percent and 110 percent of the fair market rent for the area.  24 C.F.R. § 982.503(b)(1)(i).
>
> All tenants are responsible for contributing 30% of their monthly adjusted income or 10% of their gross monthly income, whichever is greater.  42 U.S.C. § 1437f(c)(2)(A).  Tenants whose rental units cost more than the payment standard have a higher expected contribution.  Such tenants must also pay any amount by which their rent exceeds the established payment standard.  42 U.S.C. § 1437f(o)(2)(B).  In either case, the subsidy covers the balance of the rent.

*Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1184–85 (9th Cir. 2015) (footnotes omitted).

A disabled person may request an exception payment standard to help the person rent a unit that meets their needs.  Revision for Requests for Exception Payment Standards for Persons with Disabilities as a Reasonable Accommodation, Notice PIH 2013-18 (HA).  "On a case-by-case basis, as a reasonable accommodation, a PHA may approve a payment standard amount up to 110% of the published fair market rent (FMR)."  *Id.*  A PHA must procure approval from the Housing and Urban Development ("HUD") Field Office Public Housing Director for exception payment standards above 110% and up to 120% percent of the FMR, and HUD Headquarters' approval for exception payment standards higher than 120% of the FMR.  *Id.* (citing 24 CFR §§ 982.503(c)(2)(ii), 982.505(d)).

**B.    Mengistu's Attempt to Rent the Property**

On March 19, 2017, Mengistu visited the Property, accompanied by a caregiver. (DSUF 4.)  Although steps at the entrance to the unit prevented Mengistu from entering, his caregiver briefly toured the unit.  (PAMF 53.)  Mengistu indicated that he

wanted to rent the apartment but would need a ramp installed at the entrance. (DSUF 7.)  Over the next few days, Defendants installed a ramp at their expense. (DSUF 8.)

The day after his first visit, and as required under the Section 8 program, Mengistu submitted a Request for Tenancy Approval Form to HACLA.  (PAMF 55.) Mengistu also submitted to HACLA a Request for Exception to Payment Standard. (*Id.*)

On April 5, 2017, Navi prepared and sent Mengistu a rental agreement for his signature.  (DSUF 9.)  Navi did not hear from Mengistu until April 10, 2017, when Mengistu emailed Navi and explained that he was not ready to sign the lease because he had not yet heard back from HACLA regarding his application.  (DSUF 12–13.) Mengistu explained that, before signing the lease, he wanted to learn from HACLA how much he would be responsible for paying for rent and utilities each month, and he also wanted to learn if HACLA would approve his Request for Exception to Payment Standard.  (DSUF 13.)  Eventually, Mengistu obtained his monthly payment amounts from HACLA, and on April 13, 2017, he emailed Navi confirming that he had this information and that HACLA told him to address accessibility issues directly with Defendants.  (DSUF 17, 19.)

On April 19, 2017, Mengistu again visited the Property and was able to enter using the ramp Defendants had installed.  (DSUF 24; PAMF 56.)  When touring the apartment, Mengistu discovered accessibility issues in the bathroom, and Navi invited Mengistu to provide a written list of bathroom modifications necessary to accommodate his disability.  (PAMF 57, 59.)  Navi confirmed he would allow the modifications to be made but stated that HACLA required Mengistu to sign the lease before undertaking any such modifications.  (DSUF 26.)

The next day, Mengistu emailed Navi, offering the following proposal:

I . . . requested [from HACLA] an update on my reasonable accommodation request and was told to first discuss the matter (accessibility features) with the owner.  In other words, in the event you

> require higher rent to compensate you for any modification(s) you might
> be willing to perform, my requested exception to payment standard might
> meet your need.  You don't have to take my word, see the documents from
> the housing authority I provided to you.

(DSUF 28; PAMF 59.)   Navi then emailed Mengistu, indicating that he would be cancelling Mengistu's application and looking for another tenant if he did not receive Mengistu's signed rental agreement by the end of the day.  (DSUF 30.)  In response, Mengistu sent Navi the list of modifications Navi had requested the day prior, but not a signed lease agreement.  (DSUF 31.)

Navi did not immediately cancel Mengistu's application.   Instead, after speaking with his attorney regarding his obligations to engage in the interactive process regarding accommodation requests of disabled applicants, Navi hired an accessibility specialist to survey the Property and determine what modifications would be required to make it accessible.  (PAMF 60, 61.)  Navi told Mengistu to wait for the results of the survey so that Navi could request an exception to offset the cost of the modifications, as Mengistu suggested.   (PAMF 61.)   On May 9, 2017, Defendants received an estimate for modifications based on the survey results: $12,800 for the bathroom and $18,040 for the remainder of the modifications, corresponding to a total of $30,840.  (DSUF 35; PAMF 64.)

At that point, Defendants informed HACLA that it would not be possible to proceed with renting to Mengistu because of the high cost of the modifications. (DSUF 36.)  Mengistu then immediately signed the rental agreement and delivered it to HACLA, but HACLA refused to accept it because the start date was incorrect and Defendants refused to correct it.   (PAMF 67–69.)   On May 11, 2017, Navi sent Mengistu a letter of cancellation, copied to HACLA.  (DSUF 37; PAMF 70.)  In the letter of cancellation, Navi reiterated that HACLA indicated it would not directly pay for the cost of modifications to make the unit accessible.  (DSUF 38.)

On May 11, 2017, HACLA advised Mengistu that his Request for Tenancy Approval had been cancelled.  (DSUF 44.)  His then-current Section 8 voucher term

expired the next day, on May 12, 2017.  (DSUF 45.)  Thereafter, Mengistu emailed Navi twice, both times asking Defendants to reconsider their decision, reinstate Mengistu's application, and submit a Request for Exception to Payment Standard. (PAMF 72–73.)  Defendants refused.  (PAMF 74.)

On June 12, 2017, Defendants' then-attorneys sent Mengistu a letter confirming Defendants' prior decision not to bear the cost of modifications.  (PAMF 75.)  The letter reiterated that Mengistu bore the obligation to pay for any modifications and was required to remove those modifications at the end of the tenancy.  (DSUF 46.)  In the same letter, Defendants extended an offer for Mengistu to rent a different apartment, but Mengistu never responded, and Defendants eventually learned from HACLA that he found a different place to live.  (DSUF 47.)

**C.   This Lawsuit**

On June 12, 2019, exactly two years after he received the letter from Defendants' attorneys, Mengistu brought this suit against Defendants, asserting claims for (1) disability discrimination in violation of the Fair Housing Act ("FHA"); (2) disability discrimination in violation of California's Fair Employment and Housing Act ("FEHA"); (3) violation of the Unruh Civil Rights Act, California Civil Code § 51; (4) retaliation in violation of the FHA and FEHA; and (5) negligence. (Compl., ECF No. 1.)

The parties filed their pretrial documents in this case in September 2020 for a November 2020 jury trial, but the trial was continued several times due to COVID-19. Finally, on February 28, 2022, at the Final Pretrial Conference, the Court modified the scheduling order to provide Defendants time to move for summary judgment.  (Min. Order, ECF No. 63.)  This Motion followed.

## III.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where the

resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Franciscan Ceramics*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted). Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to present evidence establishing an essential element of its claim or defense when that party will ultimately bear the burden of proof on that claim or defense at trial. *See Celotex*, 477 U.S. at 322.

## IV.   DISCUSSION

Mengistu's first cause of action is for discrimination in violation of the FHA. The FHA broadly prohibits discrimination against persons with disabilities. *See* 42 U.S.C. § 3604(f). Such discrimination includes discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or making a dwelling "unavailable" to a handicapped person. 42 U.S.C. § 3604(f)(1)(A), (2)(A). This, in turn, includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Mengistu's second claim is a state-law analogue brought under the FEHA.  In federal court, the standards for FHA and FEHA housing discrimination causes of action are the generally same, *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001).  To prove such a claim, a plaintiff must show that: (1) the plaintiff or their associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) the defendant knew or should reasonably be expected to know of the handicap; (3) accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the defendant refused to make the requested accommodation. *Dubois v. Ass'n of Apartment Owners of 2987 Kalalaua*, 453 F.3d  1175, 1179 (9th Cir. 2006).   Mengistu's third claim is for failure to provide reasonable accommodation in housing under the California Unruh Civil Rights Act, which the Court analyzes coextensively with his claims under the FHA and the FEHA.  *See, e.g.*, *Mengistu v. Hous. Auth. of the City of L.A.*, 742 F. App'x 247, 248 (9th Cir. 2018) (analyzing as part of a single, coextensive inquiry plaintiff's claims for failure to reasonably accommodate under FHA, FEHA, and Unruh Act).

Defendants move for summary judgment on two separate, independent grounds.  First, they argue that Mengistu's claims are all barred by a two-year statute of limitations.  Second, they argue that they did not commit discrimination because the law does not require them to cover the cost of accessibility-related modifications, either directly or by first seeking government assistance.  For the reasons that follow, both these contentions have merit, and either is a sufficient independent basis upon which to grant the Motion.

## A.    Statute of Limitations

Defendants assert, and Mengistu does not contest, that each of Mengistu's five causes of action is limited by a two-year statute of limitations.   (Mot. 8–9; *see generally* Opp'n.)  Mengistu initiated this action on June 12, 2019.  Therefore, any claims that accrued before June 12, 2017, are time-barred.

A cause of action accrues, and the limitations period begins to run, "when a plaintiff has a complete and present cause of action." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 962 (2017) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014)). California precedent holds that a cause of action accrues "when the claim is complete with all its elements," *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999), or "when the elements of the cause of action, including damage[,] occur," *County of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 317 (2006). By Mengistu's own description, his case "is based on Defendants' refusal to rent to him based on his disability," (Opp'n 2), which includes their refusal to submit a Request for Exception to Payment Standard and apply the additional funds toward modifications to the property, (Opp'n 9). Therefore, Mengistu's causes of action accrued the moment Defendants decided to rent the unit to someone else, for the allegedly prohibited reason. This happened on May 11, 2017, when Navi informed Mengistu that his application was cancelled and HACLA informed him of the same. Mengistu concedes as much when he declares that, *before* June 12, 2017, "Defendants refused to reconsider, revise the lease start date, or submit a new Request for Tenancy Approval or any Request for Exception to the Payment Standard." (Decl. Neway Mengistu ("Mengistu Decl.") ¶ 21, ECF No. 65-1.) Thus, Mengistu's causes of action accrued on May 11, 2017, more than two years before he filed this suit.

Mengistu argues that his causes of action did not accrue until June 12, 2017, when Defendants' attorney sent Mengistu a letter confirming that Mengistu, not Defendants, would be responsible for paying for any modifications. (Opp'n 9 ("The June 12, 2017 letter itself was discriminatory, because it purported to deny Mr. Mengistu's requests for a reasonable accommodation . . . ."); *see* Mengistu Decl. Ex. ("June 12 Letter"), ECF No. 65-2.) But the June 12 letter merely confirms a prior decision that Defendants had already made and a prior action that Defendants had already taken. This letter, in and of itself, did nothing to alter Mengistu's legal

1  position to his detriment.  Mengistu's legal position had already changed one month
2  prior when Defendants refused to pay for alterations and cancelled Mengistu's
3  application.  That Mengistu may have reiterated either of his requests (to reinstate his
4  application or to submit to HACLA a Request for Exception to Payment Standard),
5  and that Defendants may have reiterated their refusals, does not change the result.  If
6  Mengistu's theory is accepted, then every time two parties to a lawsuit discussed their
7  respective positions and failed to settle the case, the limitations clock would reset and
8  begin anew.  This result is untenable and finds no support in case law.

9         Mengistu cites to law regarding the continuing violations doctrine, but the
10  continuing violations doctrine is simply inapplicable to this case.  As explained by the
11  Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982),
12  statutes of limitation "are intended to keep stale claims out of the courts," but that
13  staleness concern disappears "[w]here the challenged violation is a continuing one."
14  *Id.*  Thus, for FHA claims, "'[u]nder the continuing violation doctrine, a plaintiff's
15  complaint will not be time-barred if the defendant's related wrongful acts continue
16  into the statute of limitations time frame.  As a consequence, the statute of limitations
17  only begins to run . . . upon the last act in a series of related wrongful acts."  *Silver*
18  *State Fair Hous. Council, Inc. v. ERGS, Inc.*, 362 F. Supp. 2d 1218, 1221 (D. Nev.
19  2005) (quoting *Moeske v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492, 500 n.10 (E.D.
20  Va. 2002)); *see also City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047,
21  1058–59 (C.D. Cal. 2014) ("Where a plaintiff challenges not merely a single incident
22  of conduct that violates the FHA, but rather a pattern or practice of discrimination, the
23  statute of limitations runs from the last asserted occurrence.").  That said, the Ninth
24  Circuit has cautioned against "confus[ing] a continuing violation with the continuing
25  effects of a past violation" in the FHA context, *Garcia v. Brockway*, 526 F.3d 456,
26  462 (9th Cir. 2008), explaining that "[a] continuing violation is occasioned by
27  continual unlawful acts, not by continual ill effects from an original violation," *id.*
28  (quoting *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir. 1981) (alteration in original)).

1   Here, the continuing violations doctrine is inapplicable for the simple reason
2   that there were not multiple acts or events of discrimination.  Instead, there was a
3   single act of purported discrimination—Defendants' alleged refusal to rent him the
4   property, with or without reasonable accommodation, on allegedly discriminatory
5   grounds—and this act of discrimination was complete by May 11, 2019, when
6   Mengistu learned from both Defendants and HACLA that he was no longer a
7   candidate for the unit.  To the extent the June 12 letter was discriminatory, it changed
8   nothing about the circumstances that was not already the case by one month prior.  *See*
9   *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007) ("[C]urrent
10  effects alone cannot breathe life into prior, uncharged discrimination; . . . such effects
11  in themselves have 'no present legal consequences.'" (quoting *United Air Lines v.*
12  *Evans*, 431 U.S. 553, 558 (1977))), superseded by statute as stated in *Bush v. Orange*
13  *Cnty. Corr. Dept.*, 597 F. Supp. 2d 1293, 1296 (M.D. Fla. 2009); *cf. Garcia*, 526 F.3d
14  at 463 (citing *Ledbetter* in context of FHA design-and-construction claim).

15  For these reasons, Mengistu's claims are barred by the statute of limitations as a
16  matter of law, and the Court grants the Motion on this basis.

17  **B.   Discrimination**

18  Mengistu's causes of action also fail because no case law suggests that a
19  landlord is required to apply for federal funds as a reasonable accommodation of a
20  housing applicant's disability.  Moreover, Defendants successfully demonstrate that
21  their reasons for not renting the unit to Mengistu were not a pretext for discrimination,
22  and Mengistu fails to submit evidence upon which a reasonable jury could find a
23  discriminatory motive.

24  As a preliminary matter, the parties argue past each other somewhat in terms of
25  the theory of the case and which analytical approach the Court should apply.  In the
26  moving papers, Defendants characterized Mengistu's claims as claims for failure to
27  provide reasonable accommodations.  (Mot. 9–10.)  In the Opposition, Mengistu
28  objects to this characterization, explaining that his case is about discrimination, that is,

a refusal to rent a unit to Mengistu based on his membership in the protected class of disabled individuals.  (Opp'n 2.)  Mengistu's theory is that Defendants accomplished this discrimination in two ways: by "(1) obtaining a bid to do substantially more work than Mr. Mengistu requested for the purpose of denying him housing, and/or (2) by refusing to submit a Request for Exception to the Payment Standard to HACLA so that Defendants could obtain reimbursement for the cost of the improvements." *Id.*

In resolving this tension, the Court rejects any suggestion by Mengistu that the "reasonable accommodations" required by 42 U.S.C. § 3604(f)(3)(B) include making substantial modifications to a property at the landlord's sole expense.  Such a reading would obliterate the provision in the previous subdivision which indicates that discrimination occurs when the landlord refuses to permit reasonable modifications "at the expense of the disabled person."  42 U.S.C. § 3604(f)(3)(A).

Moreover, the Court roundly rejects the contention that Defendants obtained a bid to do substantially more work than Mengistu requested as part of some sort of pretextual attempt to generate an excuse not to rent to him.  In the first place, as discussed further below, Defendants did in fact offer to rent Mengistu the unit.  In the second place, the natural reading of the record is that Defendants ordered a complete accessibility survey in order to discover and cure *all* accessibility issues before Mengistu moved in; any suggestion that this decision was pretextual is based on mere speculation and not on any testimony or other evidence in the record.  Third, and perhaps most importantly, Mengistu does not dispute that the bathroom modifications he asked for were estimated to cost over $12,000 and that he did not offer to pay for those modifications.  Nothing in the record suggests Defendants were willing to pay $12,000 but not $30,000.  For this reason, the assertion that obtaining an inflated bid was pretextual is speculative and finds no substantial support in the evidence submitted.

With these aspects of Mengistu's theory ruled out, the parties' positions are somewhat more congruent.  Mengistu's theory of the case is that Defendants refused

to apply for an exception payment standard (an accommodation Mengistu argues was reasonable), and that the failure to do so amounted to a discriminatory failure to rent the unit (a decision not to rent to Mengistu *because* he was disabled).  This theory, however, suffers from two fatal flaws.  First, the accommodations on which Mengistu insists were not reasonable to begin with, and because Defendants in fact offered to let Mengistu sign the lease and rent the apartment, Mengistu fails to demonstrate that Defendants took any adverse action against him.  Second, there is no genuine dispute regarding whether an animus against disabled people motivated any of Defendants' actions and decisions.

        *1.    Requested accommodation not reasonable; no adverse action*

Mengistu's claims are based on the fundamental contention that a landlord may be required, as a reasonable accommodation for a disabled applicant or tenant, to apply for government funding, finance accessibility-related modifications, and recoup the cost from the government funds as the installments come in.  But Mengistu cites no case law in which a court has found such an accommodation to be a part of a landlord's obligations under the FHA or the FEHA.  Moreover, 24 C.F.R. § 982.503 contains no indication that the scheme for exceptions to the payment standard was designed to provide installment payments for accessibility-related alterations to apartment units.  This Court declines to expand the scope of the FHA or FEHA without precedent supporting such an expansion.[1]

Given that, as a matter of law, Defendants were not required to provide Mengistu the accommodation of applying for an exception payment standard and financing modifications, Mengistu is left with no adverse action on which to base his

---

[1] Notably, when housing authorities such as HACLA and HUD grant exceptions to payment standards to disabled individuals, they (HACLA and HUD) do so expressly as a reasonable accommodation, to allow the disabled person to rent a slightly more expensive unit that might better accommodate their needs.  But the fact that housing authorities do this as their own type of reasonable accommodation does not mean that landlords  are required to petition the housing authority for such an accommodation as part of the landlords' own reasonable accommodation obligations.

1   claims.   Importantly, Defendants did indeed offer Mengistu the unit, and they

2   repeatedly invited him to sign the rental agreement for about a month before deciding

3   to look for another tenant.  Mengistu did not sign the lease because Defendants did not

4   apply for an exception payment standard.  But, as just discussed, Defendants were not

5   obligated under fair housing law to apply an exception payment standard.  Therefore,

6   Defendants' refusal to apply for an exception payment standard cannot be equated to

7   making the unit "unavailable" to Mengistu.  42 U.S.C. § 3604(f)(1)(A).

8          For this reason, Mengistu cannot establish his claim, and Defendants are

9   entitled to judgment as a matter of law.

10         *2.     No discriminatory motive*

11         Defendants are also entitled to summary judgment due to lack of a

12   discriminatory motive.  Setting aside whether one or more of Defendants' actions

13   qualifies as an adverse action for purposes of housing discrimination, Mengistu's

14   claims also fail because he presents no evidence establishing a causal connection

15   between any action of Defendants, on one hand, and the fact that Mengistu is disabled,

16   on the other hand.

17          In their Motion, Defendants set forth and substantiate the reason why they did

18   not rent the unit to Mengistu: they were unable to cover the cost of the modifications

19   and also unable to obtain funding for the modifications from HACLA.  (*See* DSUF

20   41–43.)  Mengistu indicated that he would not pay for modifications himself, and

21   almost a month had gone by with the rental agreement not signed and the unit not

22   rented.  In his letter of cancellation to Mengistu, Navi expressly cited "financial

23   hardship" as the reason for cancelling Mengistu's application.  (Decl. Albert Navi

24   ("Navi Decl.") ¶ 38, Ex. 15 ("May 11 Navi Letter"), ECF No. 64-19.)  This reason is

25   supported by substantial evidence in the record; the fact that Navi stated this as the

26   reason at the time further supports the notion that this was the true reason Defendants

27   did not rent the unit to Mengistu, as opposed to a reason manufactured in hindsight for

28   the purposes of litigation.  (Navi Decl. ¶ 36, ECF No. 64-3.)

In the face of this showing, Mengistu had the burden to present evidence that could lead a reasonable jury to find otherwise, that is, that Defendants' stated reasons for cancelling Mengistu's application were pretextual, and the true reason for doing so was that Defendants did not want to rent a unit to a disabled person.  To meet this burden, Mengistu needed to present more than a "scintilla" of evidence on the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000); *cf. Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

Mengistu fails in this burden.  In his Opposition, he simply suggests, without any citation to evidence, that "[a] jury could find that both of [Defendants'] denials of accommodations and services"—referring to Defendants' refusal to rent to Mengistu based on a claimed inability to afford the modifications, and their related refusal to apply for a Request for Exception to Payment Standard—"were pretextual because Defendants later decided that having a handicapped tenant was too much trouble." (Opp'n 10.)   But given that this assertion is entirely untethered to any sort of deposition testimony, written communications, or other evidence suggesting or implying any sort of discriminatory animus, Mengistu's unsupported suggestion amounts to no more than speculation.  *Sterling*, 404 F. Supp. 2d at 1183.  Such a showing is insufficient to defeat Defendants' demonstration that they made reasonable efforts to engage in an interactive process with Mengistu, offered him the options to which he was entitled under the law, and ultimately cancelled his application because he would not sign the lease in a timely manner.  Summary judgment may also be properly granted on this ground.

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment.  (ECF No. 64.)  The Court hereby **VACATES** the Final Pretrial

Conference, the trial, and all other dates and deadlines.   The Court will issue Judgment consistent with this Order.

**IT IS SO ORDERED.**

June 15, 2022

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**